**UNITED STATES of America, Plaintiff—Appellee,**

v.

**Bruce Derek SPRING aka Bruce Derek Walls, Defendant—Appellant.**

No. 94–4262.

United States Court of Appeals, Tenth Circuit.

April 2, 1996.

Jenine Jensen, Assistant Federal Public Defender (Michael G. Katz, Federal Public Defender, with her on the briefs), Denver, Colorado, for defendant-appellant.

Wayne T. Dance, Assistant United States Attorney (Scott M. Matheson, Jr., United States Attorney, with him on the briefs), Salt Lake City, Utah, for plaintiff-appellee.

Before ANDERSON, BARRETT, and MURPHY, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

Defendant Bruce Derek Spring, aka Bruce Derek Wells, appeals his conviction and 802 month prison sentence arising out of fire-arms violations and a series of bank robberies in Utah and Colorado, in which Mr. Spring and Matthew Corey Monitz were involved. For the following reasons, we affirm in part and reverse and remand in part.

## BACKGROUND

Mr. Spring was arraigned on August 19, 1993 on a five-count indictment charging him with two counts of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 2 and 922(g); one count of aiding and abetting Mr. Monitz in the commission of an armed bank robbery at West One Bank in Kearns, Utah, in violation of 18 U.S.C. §§ 2 and 2113(d); one count of aiding and abetting Mr. Monitz in the using and carrying of a pistol in relation to the West One Bank robbery, in violation of 18 U.S.C. § 924(c); and one count of aiding and abetting Mr. Monitz in the commission of a bank robbery at First Security Bank in Salt Lake City, Utah, in violation of 18 U.S.C. §§ 2 and 2113(a). Mr. Spring and Mr. Monitz were tried separately. Trial for Mr. Spring was set for October 4, 1993.

A superseding indictment was filed on September 8, 1993, adding three counts against Mr. Spring: (1) bank robbery of the University of Utah Credit Union in Salt Lake City, Utah, in violation of 18 U.S.C. §§ 2 and 2113(a); (2) conspiracy to commit bank robbery, in violation of 18 U.S.C. § 371; and (3) aiding and abetting Mr. Monitz in the using and carrying of a firearm in relation to a conspiracy to commit bank robbery, in violation of 18 U.S.C. §§ 2 and 924(c). The superseding indictment also alleged that several of the crimes charged in the original indictment were committed in furtherance of the conspiracy.

After several continuances, pursuant to Mr. Spring's request, a new trial date was set for February 7, 1994. On January 5, 1994, the grand jury filed a second superseding indictment against Mr. Spring, adding three more counts: (1) making a false statement on a federal form during the acquisition of a firearm, in violation of 18 U.S.C. § 922(a)(6); (2) aiding and abetting Mr. Monitz in the commission of an armed bank robbery at First Security Bank in Park City, Utah, in violation of 18 U.S.C. §§ 2 and 2113(d); and (3) aiding and abetting Mr. Monitz in the using or carrying of a pistol in relation to a bank robbery, in violation of 18 U.S.C. §§ 2 and 924(c).

Because of a conflict of interest resulting from the First Security Bank robbery charge, Mr. Spring's counsel requested to withdraw from the case. A hearing was held on the withdrawal motion on January 21, 1994. At the hearing, Mr. Spring stated that he wished new counsel to be appointed, and wanted to proceed to trial rather than enter into a plea agreement. The court therefore granted Mr. Spring's counsel's motion to withdraw and vacated the February 7 trial date. The government attorney then inquired: "Would there be then an order at this time that from February the 7th to the setting of the new trial date with new counsel being excluded under the Speedy Trial Act for the appropriate reasons of preparation time needed by new counsel?" R. Vol. VIII at 16. The court responded:

Yes, it would appear the provisions of the Speedy Trial Act would be tolled pending the appearance of new counsel and new counsel's indication of preparation time. But I think we ought to have new counsel appear as soon as that is reasonably possible so that we can have these new dates set.

*Id.* The court then directed the government attorney to "prepare an order reflecting the granting of the motion and also the tolling of the Speedy Trial Act." *Id.* at 17.

The order memorializing the court's findings in the January 21 hearing was not in fact entered until November 22, 1994. The Order stated in part:

The Court . . . finds that new counsel could not reasonably be prepared for trial on February 7, 1994, the currently scheduled trial date in this matter. Thus, the ends of justice served by a continuance in this matter outweigh the best interest of the public and the defendant in a speedy trial.

. . . .

IT IS FURTHER ORDERED that jury trial in this matter currently scheduled to commence on February 7, 1994, is vacated and will be rescheduled upon appointment of new counsel for defendant. The continuance resulting from this appointment of new counsel is necessary to insure continuity of counsel for defendant and to allow reasonable time necessary for effective preparation by new counsel.

IT IS FURTHER ORDERED that the time involved in this matter, from January 21, 1994 to the new trial date to be set at a later time, is excluded under the Speedy Trial Act pursuant to 18 U.S.C. § 3161(h)(8)(A), (B)(ii) and (B)(iv).

R. Vol. I at Tab 163.

New counsel was appointed for Mr. Spring on the day of the hearing, January 21, and on February 1, a telephone conference occurred between the court, Mr. Spring's new counsel and the prosecutor, in which a new trial date was set for March 28, 1994. Again, an order memorializing that conference was not entered until November 22, 1994.

On March 21, 1994, the district court conducted a hearing on a letter it had received from Mr. Spring demanding trial within 30

days.[1] The court questioned Mr. Spring about any complaints he had concerning his attorney or delays in his trial. Mr. Spring stated that he had no complaints about his current attorney, and he requested a continuance so that his attorney could adequately prepare for trial. R. Vol. IX at 9–10. Mr. Spring's attorney filed a written motion to continue the case on March 24, and at the hearing that same day on the motion, Mr. Spring responded affirmatively when the court asked him if he "waive[d][his] rights under the Speedy Trial Act pursuant to what has been discussed here." R. Vol. X at 7. At the end of the March 24 hearing, the court found that the ends of justice would best be served by granting a continuance, and the court determined that the Speedy Trial Act was tolled pursuant to 18 U.S.C. § 3161(h)(8)(B)(i), (ii), (iii) and (iv). *Id.* at 9–10. Trial was scheduled for June 20, 1994.

After several more continuances, including one sought by the government, Mr. Spring's trial finally began on September 7, 1994. Mr. Spring was convicted by the jury on all eleven counts of the second superseding indictment. He was sentenced on November 22, 1994. At his sentencing hearing, the government asked the district court to make findings concerning Mr. Spring's prior convictions for the purpose of sentencing him as an armed career criminal and a career offender.[2] The court adopted the factual findings and guideline recommendations contained in the presentence report, and concluded that Mr. Spring qualified as both a career criminal offender and an armed career criminal offender. The court determined his total offense level to be 34, with a criminal history category of VI. Mr. Spring was sentenced to a total of 802 months imprisonment, calculated as follows: 262

months for each conviction on counts one through six and counts eight and ten (the § 922(g) firearms violations and the bank robbery violations), to be served concurrently; sixty months for his conviction on count seven (the § 924(c) aiding and abetting in the use or carrying of a weapon in relation to a bank robbery violation), to be served consecutively to the other counts; and two 240 month sentences, one for each conviction on counts nine and eleven (the other § 924(c) violations), both to be served consecutively to the other counts. The court also ordered restitution by Mr. Spring in the amount of $30,996.07.[3] R. Vol. XX at 15–17. This appeal followed.

Mr. Spring argues: (1) his statutory right to a speedy trial under the Speedy Trial Act was violated because ninety-two countable days had elapsed from the filing date of the indictment to his trial; (2) there was insufficient evidence supporting his conviction for the robbery of the University of Utah Credit Union and the court made an erroneous evidentiary ruling in connection with that count; (3) he was erroneously sentenced as an armed career criminal and a career offender, because his prior convictions do not qualify as three violent felonies or two crimes of violence; (4) the restitution order must be amended because a portion of the order resulted in a restitution amount that exceeded the victim's total loss; and (5) the recent Supreme Court decision of *Bailey v. United States*, —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) requires reversal of one of his § 924(c) convictions (on count eleven, for aiding and abetting in the use or carrying of a firearm during and in relation to a conspiracy to commit bank robbery.)[4]

---

1. The letter from Mr. Spring to the court is not a part of the record on appeal.

2. The government had earlier filed with the court an "Information Alleging Prior Felony Convictions and Offenses." R. Vol. I at Tab 58. The Information listed seven prior felony convictions, all occurring in Texas, and including three convictions for "Burglary of Habitation," one conviction for "Burglary of Vehicle," two convictions for "Credit Card Abuse," and one conviction for "Burglary of a Bank." *Id.*

3. At the time of the events for which he was convicted, Mr. Spring was on federal supervised release for a Texas conviction for burglary of a bank. Mr. Spring pled *no contest* to charges of supervised release violation, and he was sentenced to 24 months imprisonment, to be served concurrently with his § 924(e) sentences.

4. *Bailey* was decided after Mr. Spring's conviction and sentencing. We have received supplemental briefing from both parties on the effect of *Bailey* on this case.

**1456**

### I. *Speedy Trial Act*

■ We review de novo the trial court's application of the legal standards of the Speedy Trial Act, 18 U.S.C. §§ 3161–74, and we review for clear error its factual findings. *United States v. Pasquale*, 25 F.3d 948, 950 (10th Cir.1994). When we review the district court's decision to grant a continuance under § 3161(h)(8), we apply an abuse of discretion standard "[w]hen the court has granted a continuance after weighing established facts proper to its consideration." *United States v. Theron*, 782 F.2d 1510, 1513 n. 1 (10th Cir.1986).

Under the Speedy Trial Act, a defendant's trial must commence "within seventy days from the filing date (and making public) of the … indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). The Act specifically provides for certain exclusions from the seventy-day period, including periods of delay resulting from continuances, provided "the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(8)(A). Among the factors a court may consider in granting an ends of justice continuance are "[w]hether the failure to grant such a continuance … would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation…." 18 U.S.C. § 3161(h)(8)(B)(iv).

■ We have said that these findings may be " '*entered on the record* after the fact.' " *Pasquale*, 25 F.3d at 952 (quoting *United States v. Doran*, 882 F.2d 1511, 1516 (10th Cir.1989)). They may not, however, be " '*made* after the fact.' " *Id.* (quoting *Doran*, 882 F.2d at 1516). Thus, it must be "clear from the record that the trial court struck the proper balance when it granted the continuance." *Doran*, 882 F.2d at 1516. Courts need not necessarily *expressly* conduct a balancing or use particular language, so long as the court gives "some indication, contemporaneous with the grant of the continuance, to which the later findings referred." *Id.* at 1517.[5]

Furthermore, the Act places upon the defendant "the burden of asserting a violation of the statute, explicitly providing that the '[f]ailure of the defendant to move for dismissal prior to trial or entry of a plea of guilty or nolo contendere shall constitute a waiver of the right to dismissal under this section.' " *United States v. Gomez*, 67 F.3d 1515, 1519 (10th Cir.1995) (quoting 18 U.S.C. § 3162(a)(2)), *cert. denied,* —— U.S. ——, 116 S.Ct. 737, 133 L.Ed.2d 687 (1996).

The remedy for a violation of the Speedy Trial Act is dismissal of the indictment, with or without prejudice. 18 U.S.C. § 3162(a)(2); *see Pasquale*, 25 F.3d at 952–53.

■ Both Mr. Spring and the government agree that the period from August 19 to September 27, 1993, must be counted toward the seventy-day Speedy Trial Act period. There is also no dispute that the period from March 21 until the trial on September 7 should be excluded from the seventy-day period. The dispute involves whether the period from January 21 to March 21 should be excluded from the seventy-day period.[6]

---

**5.** In *Doran,* we discussed approvingly two other cases, in which the reviewing court approved "retroactive findings" because "something in the record of the grant of the continuance indicated that the trial court was contemplating an unusual but justifiable delay in the commencement of the trial[ ][and][t]he later record merely made this general indication more specific." *Doran,* 882 F.2d at 1517. *See United States v. Bryant,* 726 F.2d 510 (9th Cir.1984); *United States v. Brooks,* 697 F.2d 517 (3d Cir.1982), *cert. denied,* 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983).

**6.** The government argues that the disputed excluded period runs from January 21 to March 28. Mr. Spring concedes that the period from March 21 until trial was properly excluded. He also concedes that three days within that time period were properly excluded because of a defense motion for the appointment of an investigator. Thus, we view the disputed period as from January 21 to March 21, with three excluded days.

Mr. Spring argues that the delay during that period was not a continuance, because no one sought a continuance, the court did not specifically grant a continuance, and the court did not make the requisite contemporaneous ends of justice findings. He argues that this failure was not remedied by the court's November 22 *nunc pro tunc* order, because that merely made impermissible retroactive findings. Alternatively, he argues the continuance was a prohibited open-ended continuance.

The government responds that the district court *did* grant a continuance, properly, on January 21, and it *did* make the required ends of justice findings under § 3161(h)(8), later memorialized in the *nunc pro tunc* order. The government further argues that Mr. Spring waived his right to claim a speedy trial violation for that time period.

■ We must first decide whether the court did, in effect, grant a continuance when it granted defense counsel's motion to withdraw, vacated the scheduled trial date and appointed new counsel. The court did not specifically state that it was granting a continuance, yet that was indisputably the effect of its order vacating the scheduled trial date, pending appearance of new counsel to permit rescheduling the trial. We thus conclude that the court did grant a continuance on January 21.

For the Speedy Trial Act seventy-day period to be tolled by the continuance, however, the court was required to make contemporaneous ends of justice findings, either orally or in writing. The transcript of the hearing indicates that the government attorney asked if there would be "an order at this time that from February the 7th to the setting of the new trial date with new counsel being excluded under the Speedy Trial Act for the appropriate reasons of preparation time needed by new counsel?" R. Vol. VIII at 16. The court responded: "Yes, it would appear that the provisions of the Speedy Trial Act would be tolled pending the appearance of new counsel and new counsel's indication of preparation time." *Id.* The court's *nunc pro tunc* order of November 22 states that new counsel could not reasonably prepare for a February 7 trial date, and the "ends of justice served

by a continuance in this matter outweigh the best interest of the public and the defendant in a speedy trial." R. Vol. I at Tab 163. It therefore excluded the period "from January 21, 1994 to the new trial date." *Id.*

At the sentencing hearing, when the *nunc pro tunc* order was entered, the government attorney stated that "[t]he proposed orders that I have submitted to the Court this morning do simply formalize rulings previously made by this Court as reflected in both the docket sheets and in the recorded proceedings previously occurring before the Court." R. Vol. XX at 5. The court responded, "I have reviewed the orders and they do, in view of the Court, comport with the action that the Court had heretofore taken in this matter." *Id.* When asked for comment, Mr. Spring's attorney said, "I guess essentially our position on these is I don't recall without reviewing the docket statement." *Id.*

■ While obviously the oral proceedings on January 21 were not a model of clarity (the government attorney refers to February 7, although the continuance was granted that day, January 21), what *is* clear is that the reason for granting the continuance is that new counsel would be unable to prepare for the upcoming trial scheduled on February 7. Adequate preparation time and continuity of counsel are clearly permissible reasons for granting a continuance and tolling the Speedy Trial Act. *See* 18 U.S.C. § 3161(h)(8)(B)(ii), (iv); *Doran,* 882 F.2d at 1515–16. In *Doran,* we discussed *United States v. Bryant,* 726 F.2d 510 (9th Cir.1984), in which the court granted a continuance because the defendant's case "was so complex as to justify more time for adequate preparation." *Id.* at 511. The court held that was a sufficient contemporaneous finding to justify the continuance and the exclusion of the period from the Speedy Trial Act. While more detailed findings might have been preferable in this case, "it is clear from the record that the trial court struck the proper balance when it granted the continuance." *Doran,* 882 F.2d at 1516.

■ Mr. Spring next argues that the continuance was improper because it was open-

ended. "The Circuits are split over the question whether open-ended continuances are permissible under the Speedy Trial Act." *United States v. Jones,* 56 F.3d 581, 586 n. 10 (5th Cir.1995). The First and Third Circuits have stated that open-ended continuances to serve the ends of justice are not prohibited, provided "they are reasonable in length." *United States v. Lattany,* 982 F.2d 866, 868 (3d Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 97, 126 L.Ed.2d 64 (1993); *see also United States v. Rush,* 738 F.2d 497, 508 (1st Cir.1984) (observing that "it is inevitable that in some cases, like the present one, a court is forced to order an (h)(8) continuance without knowing exactly how long the reasons supporting the continuance will remain valid"), *cert. denied,* 470 U.S. 1004, 105 S.Ct. 1355, 84 L.Ed.2d 378 (1985). The Fifth Circuit has also held that open-ended continuances are not prohibited, but noted that "such a continuance for any substantial length of time is extraordinary and must be adequately justified by the circumstances of the particular case." *Jones,* 56 F.3d at 586. The Ninth Circuit has held that "an 'ends of justice' continuance be specifically limited in time." *United States v. Jordan,* 915 F.2d 563, 565 (9th Cir.1990). The Second Circuit has stated that "[t]he length of an exclusion for complexity must be ... limited in time." *United States v. Gambino,* 59 F.3d 353, 358 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1671, —— L.Ed.2d —— (1996) (No. 95–847). However, the *Gambino* court slightly equivocated in the very next sentence, observing that *"[g]enerally* a trial court should set at least a tentative trial date in granting a complex case exclusion." *Id.* (emphasis added).

We agree with the First, Third, and Fifth Circuits that, while it is preferable to set a specific ending date for a continuance, there will be rare cases where that is not possible, and an open-ended continuance for a reasonable time period is permissible. This is such a case. The continuance was necessary because defense counsel discovered a conflict of interest some two weeks prior to the scheduled trial date on a complex, eleven-count indictment, which exposed Mr. Spring to very substantial prison time. Without new counsel present, however, it was impossible to set an acceptable new trial date, which would allow new counsel to adequately prepare. In granting the continuance, the court specifically directed that new counsel should appear "as soon as that is reasonably possible so that we can have these new dates set." R. Vol. VIII at 16. The new trial date was set, thereby providing a specific ending date to the continuance, eleven days later, on February 1. Given the circumstances of this case, the open-ended continuance initially granted was reasonable in length.[7]

In sum, we hold that the district court did not abuse its discretion in granting a continuance on January 21, and we find that the period from January 21 to March 21 is properly excludable under the Speedy Trial Act. Mr. Spring's rights under the Speedy Trial Act were therefore not violated.

## II. *Sufficiency of the Evidence on Credit Union Robbery*

Mr. Spring was charged in count three of the indictment with robbing the University of Utah Credit Union. The facts relating to this robbery are as follows: On March 1, 1993, a man approached teller Tristin Christensen's window, asked if the window was open, and handed her a note which said, "this is a robbery, no dye packs." R. Vol. XV at 48–51. As she was gathering up money, the robber said "that's it, that's it" to Ms. Christensen. *Id.* at 52. Ms. Christensen gave him $1144, and the robber left. Ms. Christensen worked with a police sketch artist to create a drawing of the robber. She testified at trial that the hair in the drawing was redder than the actual robber's hair. *Id.*

7. In cases finding open-ended continuances to be improper, the facts are far more egregious than in this case. In *Jones,* for example, one year elapsed between a motion for a continuance and a motion to dismiss filed on speedy trial grounds. During that time, the scheduled trial date passed without the commencement of the trial. In holding that "the open-ended continuance silently granted by the district court constitutes an abuse of the Speedy Trial Act," the Fifth Circuit observed that "there is absolutely nothing in the record regarding [the] motion—no indication whatsoever that the district court granted, postponed, or in any way reacted to it." *Jones,* 56 F.3d at 584–85.

at 55. The record on appeal contains both the sketch artist's drawing and a photograph of Mr. Spring, R. Supp. Vols. V, VI, and they are similar. The jury was permitted to see both items.

Ms. Christensen also participated in two line-ups, one occurring one month after the robbery and one occurring six months after the robbery. At the first line-up, she was unable to make a positive identification, although she was able to identify a person in the line-up who "looked similar to that man that robbed us." R. Vol. XV at 56. Mr. Spring was not in that line-up. At the second line-up, in which Mr. Spring did participate, the participants were asked to say "are you open" and "that's it." Ms. Christensen again was not able to make a positive identification, but she did identify a person in the line-up as having "a similar appearance and also similar sounding voice as the person who robbed us." *Id.* at 58. That person was not Mr. Spring. At trial, Ms. Christensen identified Mr. Spring as looking similar to the two individuals she had identified in the line-ups.

Bureau of Alcohol, Tobacco & Firearms agent Duane Jackson participated in the second line-up. He testified that during the line-up, the participants were asked to file in and out of the line-up room several times, and, during one of the line-ups, to say three times "are you open" and "that's it." *Id.* at 71. He further testified that, when the participants returned to the waiting room following that particular line-up sequence, several of them directed questions at Mr. Spring asking "why are they making us say this stuff." *Id.* at 72. Agent Jackson stated that he "observed Mr. Spring to respond to that question, we didn't say anything like that, I don't know what they are talking about." *Id.* When Mr. Spring testified at his trial, he was asked whether he had made those statements, to which he responded "That, or something to that effect." R. Vol. XIX at 925. The government attorney then asked, "When you used the word we, you were referring to yourself and Mr. Monitz; is that right?" *Id.* Mr. Spring responded, "[r]eferring to the felony complaint, yes, sir." *Id.*

The government presented testimony from a Salt Lake County Sheriff crime technician, who testified that a latent fingerprint from the demand note matched Mr. Spring's fingerprint. R. Vol. XVI at 230–35. The technician testified that there were other latent fingerprints on the note, but that they matched neither Mr. Spring nor any other known individual. The government also presented testimony from an FBI fingerprint specialist, who testified that he found three latent fingerprints on the demand note which matched Mr. Spring's fingerprints. R. Vol. XV at 151–52. The defense presented testimony from a handwriting expert, who expressed the opinion that Mr. Spring did not write the demand note. R. Vol. XVIII at 707, 724–25.

■ Mr. Spring argues there was insufficient evidence supporting his conviction for the Credit Union robbery. "We review the sufficiency of the evidence in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Jones,* 44 F.3d 860, 864 (10th Cir.1995). We have stated that "the jury may draw reasonable inferences from direct or circumstantial evidence," but the inferences "must be more than speculation and conjecture to be reasonable." *Id.* at 865. Defendants challenging a conviction on sufficiency of the evidence grounds face a "difficult standard" of review, *United States v. Hoenscheidt,* 7 F.3d 1528, 1530 (10th Cir.1993), as we "reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Wacker,* 72 F.3d 1453, 1462–63 (10th Cir.1995).

Mr. Spring argues that, except for the fingerprint evidence, there is no other evidence proving he committed the Credit Union robbery. We have stated, as have some other courts, that "standing by itself, [fingerprint evidence] would be insufficient to support a conviction." *United States v. Milano,* 443 F.2d 1022, 1025 (10th Cir.) (fingerprints found on brown paper bag), *cert. denied,* 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 258 (1971); *see also Mikes v. Borg,* 947 F.2d 353, 356–57 (9th Cir.1991) ("[I]n fingerprint-only cases in which the prosecution's theory is based on

the premise that the defendant handled certain objects *while committing the crime in question,* the record must contain sufficient evidence from which the trier of fact could reasonably infer that the fingerprints were in fact impressed at that time and not at some earlier date."), *cert. denied,* 505 U.S. 1229, 112 S.Ct. 3055, 120 L.Ed.2d 921 (1992); *United States v. Corso,* 439 F.2d 956, 957 (4th Cir.1971) ("The probative value of an accused's fingerprints upon a readily movable object is highly questionable, unless it can be shown that such prints could have been impressed *only* during the commission of the crime."); *United States v. Collon,* 426 F.2d 939, 942 (6th Cir.1970). The government does not seriously dispute that the fingerprint evidence, standing alone, would be insufficient to support Mr. Spring's conviction. Rather, it relies upon the fingerprint evidence, in conjunction with Agent Jackson's testimony about Mr. Spring's comment during the line-up, and the similarity between the photograph of Mr. Spring and the sketch artist's drawing of the suspect, along with Ms. Christensen's testimony that the hair in the drawing was redder than the suspect's hair, as additional evidence supporting the conviction.

We hold that there was sufficient evidence to support Mr. Spring's conviction for the Credit Union robbery. The standard is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jones,* 44 F.3d at 864. Here, while the teller, Ms. Christensen, was unable to positively identify Mr. Spring, soon after the robbery she helped prepare a sketch of the robber which bears a marked resemblance to Mr. Spring. Additionally, the jury could infer from Mr. Spring's comment at the line-up that he was acknowledging that he was present at the robbery, but disputes having said the words which he was asked to say during the line-up. This evidence, along with the fingerprint evidence, is sufficient to support the jury's ver-

dict. We therefore hold that Mr. Spring has failed to meet the difficult burden of proving that the evidence was insufficient.

■ Mr. Spring also argues that the court erred in not allowing the defense to present statements made by Wayne Becker to an F.B.I. agent. Mr. Becker was told by F.B.I. agent Jeffrey Kearl that there was evidence connecting him to the Credit Union robbery. He was further "told that the handwriting of the demand note used in the robbery matched the writing on a demand note that Becker used in a previous San Francisco bank robbery. Becker was also told that the prime suspect of the University of Utah Credit Union robbery was Bruce Derek Spring." R. Vol. XVIII at 629.[8] Mr. Becker then told Agent Kearl that he (Becker) was involved in the Credit Union robbery, but he would not say what his role was. He said that Mr. Spring did not commit the robbery, and that he (Becker) "would take responsibility for the robbery if they needed a fall guy." *Id.*[9]

■ Mr. Spring sought to have Mr. Becker's hearsay statements admitted under Fed. R.Evid. 804(b)(3) as a statement against interest. The district court denied its admission, concluding that "there is no evidence that would establish sufficient indicia of trustworthiness, reliability, that would indicate the statement being of sufficient value to be allowed." *Id.* at 633. Evidentiary rulings are committed to the sound discretion of the district court. We therefore review them only for an abuse of discretion. *United States v. Elkins,* 70 F.3d 81, 82 (10th Cir. 1995); *United States v. Porter,* 881 F.2d 878, 882 (10th Cir.), *cert. denied,* 493 U.S. 944, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989).

■ A defendant seeking to admit hearsay evidence under Rule 804(b)(3) to exculpate himself must show "'(1) an unavailable declarant; (2) a statement against penal interest; and (3) sufficient corroboration to indicate the trustworthiness of the state-

---

8. As the government conceded, a Utah State Crime Lab criminalist examined the demand note in the Credit Union robbery and notes used by Mr. Becker in two California bank robberies, and concluded that they were written by a common author. R. Vol. XVIII at 693.

9. Mr. Becker was not available to testify at Mr. Spring's trial. The government attorney recounted the substance of Mr. Becker's statements to Agent Kearl.

ment." *Porter,* 881 F.2d at 882. Rule 804(b)(3) itself states that "corroborating circumstances [must] *clearly* indicate the trustworthiness of the statement." Fed.R.Evid.R. 804(b)(3) (emphasis added). The government concedes Mr. Becker's unavailability and that the statement would be against penal interest. It argues that the district court correctly held that there was insufficient corroboration of the trustworthiness of Mr. Becker's statement. "The determination of the sufficiency of such corroborating evidence 'lies within the sound discretion of the trial court, which is aptly situated to weigh the reliability of the circumstances surrounding the declaration.'" *Porter,* 881 F.2d at 883 (quoting *United States v. Guillette,* 547 F.2d 743, 754 (2d Cir.1976), *cert. denied,* 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977)). Mr. Spring argues "[f]our major corroborating circumstances support Becker's statements." Appellant's Br. at 33. They are: (1) the F.B.I. believed that the writing on the demand note used in the Credit Union robbery matched Mr. Becker's handwriting; (2) Agent Kearl informed Mr. Becker that there was evidence connecting him to that robbery; (3) Agent Kearl advised Mr. Becker of his *Miranda* rights prior to interviewing him; and (4) no witness could identify Mr. Spring as the Credit Union robber.

Against this allegedly corroborating evidence is the fact that Mr. Becker was very vague about his involvement in the robbery. Indeed, he provided *no* information one would expect from someone who was "involved" in the robbery. Similarly, his bald assertion that Mr. Spring did not commit the robbery is otherwise unsubstantiated. While, as Mr. Spring asserts, no eyewitness identified Mr. Spring as the robber, there was evidence connecting him to the crime, which we have held is sufficient to support the jury's guilty verdict. Mr. Becker offered absolutely no *specific* information exculpating Mr. Spring and inculpating himself.

We hold that the district court did not abuse its discretion in refusing to admit evidence of Mr. Becker's statements.

### III. *Armed Career Criminal Sentence*

Mr. Spring was sentenced under the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1) ("ACCA"). Section 924(e)(1) imposes a fifteen year minimum mandatory sentence for a defendant who is convicted of being a felon in possession of a firearm under § 922(g)(1) and has three previous convictions for a violent felony or a serious drug offense. "Violent felony" is defined to include "burglary." 18 U.S.C. § 924(e)(2)(B)(ii). In *Taylor v. United States,* 495 U.S. 575, 598, 110 S.Ct. 2143, 2158, 109 L.Ed.2d 607 (1990) the Supreme Court held that for § 924(e) purposes, burglary means the "generic, contemporary meaning of burglary" which "contains at least the following elements: an unlawful or unprivileged entry into, or remaining in, a building or other structure, with intent to commit a crime." To determine whether Mr. Spring's Texas burglary convictions can be used to enhance his sentence under § 924(e) we use a "formal categorical approach, looking only to the statutory definitions of the prior offenses, and not to the particular facts underlying those convictions." *Taylor,* 495 U.S. at 600, 110 S.Ct. at 2159; *see also United States v. Green,* 55 F.3d 1513, 1515 (10th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 324, 133 L.Ed.2d 225 (1995). "If a state statute on its face defines burglary more broadly than *Taylor,* 'then a conviction obtained under such a statute may not, except in narrowly defined circumstances, be counted toward enhancement.'" *United States v. Hill,* 53 F.3d 1151, 1153 (10th Cir.) (en banc), *cert. denied,* —— U.S. ——, 116 S.Ct. 258, 133 L.Ed.2d 182 (1995). We review sentence enhancement under the ACCA de novo, and the government must prove sentence enhancement by a preponderance of the evidence. *Id.* Where, as here, the defendant fails to object to the sentence enhancement, we review for plain error. *See United States v. Smith,* 919 F.2d 123, 124 (10th Cir.1990).

Mr. Spring had, *inter alia,* three convictions for burglary of a habitation, in violation of Tex. Penal Code § 30.01(1).[10] The Texas Code defines burglary as follows:

**10.** Mr. Spring asserts that the government provided no documentation "of any kind" regarding

§ 30.02. Burglary

(a) a person commits an offense if, without the effective consent of the owner, he:

(1) enters a habitation, or a building (or any portion of a building) not then open to the public, with intent to commit a felony or theft; or

(2) remains concealed, with intent to commit a felony or theft, in a building or habitation; or

(3) enters a building or habitation and commits or attempts to commit a felony or theft.

Texas Penal Code § 30.02(a). "Habitation" is defined as "a structure or vehicle that is adapted for the overnight accommodation of persons." Texas Penal Code § 28.01.

We conclude that the statutory elements of burglary of a habitation under Texas law substantially correspond to the generic elements of burglary contained in *Taylor*. Other courts addressing this issue have so held. *See United States v. Silva*, 957 F.2d 157, 162 (5th Cir.) ("Section 30.02 of the Texas Penal Code is a generic burglary statute, punishing nonconsensual entry into a building with intent to commit a crime."), *cert. denied*, 506 U.S. 887, 113 S.Ct. 250, 121 L.Ed.2d 182 (1992); *United States v. Sweeten*, 933 F.2d 765, 770 (9th Cir.1991) ("[Defendant's] conviction for 'burglary of a habitation' [under Texas law] clearly constitutes a conviction for burglary within *Taylor*'s generic definition.").

Mr. Spring argues that, because the Texas statute, for purposes of the crime of burglary of a habitation, includes vehicles within its definition of habitation, it cannot qualify under *Taylor* as a generic burglary statute. We disagree. It is true that the Supreme Court in *Taylor* did note that some states define burglary more broadly than its generic definition, and gave as an example those statutes which include "places, such as automobiles and vending machines, other than buildings." *Taylor*, 495 U.S. at 599, 110 S.Ct. at 2158. However, the Texas Code definition of habitation does not include vehi-

cles in the sense in which *Taylor* intended. Only vehicles which are "adapted for the overnight accommodation of persons" qualify as habitations. Tex. Penal Code § 30.01(1). The Ninth Circuit in *Sweeten* considered this very argument, and we agree with its analysis:

> Given Congress's intent to define "burglary" broadly, it is implausible to suggest that [defendant's] "burglary of a habitation," as defined under the Texas statute, is not a burglary within the meaning of section 924(e)(2)(B)(ii). The burglary of a mobile home or "vehicle adapted for the overnight accommodation of persons" is not analogous to the theft of an automobile or to the other property crimes whose relative lack of severity the *Taylor* Court (and presumably, Congress) meant to exclude from its generic definition. Rather, it is analogous to the burglary of a building or house. Indeed, the burglary of a mobile home or camper is often likely to pose a greater risk of violence to the occupant or owner than the burglary of a building or house because it is more difficult for the burglar to enter or escape unnoticed. In light of these considerations, we hold that the "burglary of a habitation," as defined to mean the burglary of "a structure or vehicle adapted for the overnight accommodation of persons," constitutes the burglary of a "structure" within the generic definition of *Taylor* and thus within the meaning of section 924(e)(2)(B)(ii).

*Sweeten*, 933 F.2d at 771. Mr. Spring was correctly sentenced as an armed career criminal.

## IV. *Sentence as Career Offender*

■ Mr. Spring also challenges his sentence enhancement as a career offender under USSG § 4B1.1. Section 4B1.1 provides that a defendant is a career offender if "(1) the defendant was at least eighteen years old at the time of the instant offense, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled

these prior convictions. The record on appeal contains Plaintiff's Special Ex. No. 2, which contains certified copies of the "Judgment on Plea of Guilty or Nolo Contendere Before Court" reflect-

ing Mr. Spring's guilty pleas and includes certified copies of the original indictment for each conviction. R. Supp. Vol. IV.

substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." USSG § 4B1.1. Mr. Spring concedes he meets the first two elements of career offender status. He argues the district court erred in sentencing him under this guideline because he does not have two prior convictions for "crimes of violence."

We review de novo the Guidelines definition of "crimes of violence." *United States v. Smith,* 10 F.3d 724, 730 (10th Cir. 1993). We review for plain error when, as here, the defendant failed to object. *See United States v. Richards,* 27 F.3d 465, 468 (10th Cir.1994). The Guidelines define "burglary of a dwelling" as a crime of violence for § 4B1.1 purposes. *See* USSG § 4B1.2(1)(ii). Mr. Spring argues that his prior convictions for burglary of a habitation do not qualify as burglary of a dwelling because habitation includes structures or vehicles. We disagree. The Texas Code defines as habitations only those structures or vehicles which have been "adapted for the overnight accommodation of persons." That clearly connotes a "dwelling." Indeed, "habitation" is generally defined to mean a "dwelling place." Black's Law Dictionary 640 (5th Ed.1979). *See United States v. Cruz,* 882 F.2d 922, 923 (5th Cir.1989) (holding that burglary of a habitation qualified as a "crime of violence" under § 4B1.1). The district court did not err in sentencing Mr. Spring as a career offender.

### V. *Restitution*

Mr. Spring challenges the ordered restitution of $11,495.00 to Bank One in Fruita, Colorado. The district court ordered Mr. Spring and Mr. Monitz, his co-conspirator, and the man whom he aided and abetted in connection with various robberies for which he was indicted, to make restitution jointly and severally to the victim banks. The court assessed against Mr. Spring alone the full amount of restitution ordered to Bank One. Mr. Spring argues that this was an erroneous "oversight" and seeks reduction of his restitution order by one-half of the amount ordered to be restored to Bank One—$5,747.50.

The government responds that, since Mr. Monitz was convicted of neither the Bank One robbery nor a conspiracy involving that robbery, he could not have been ordered to make restitution to Bank One. It further argues that, because Bank One would not receive restitution from Mr. Monitz, the court did not err in assessing the whole amount against Mr. Spring, who was convicted of conspiracy to commit bank robberies and the Bank One robbery was charged as an overt act in furtherance of that conspiracy.

Restitution orders are governed by the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. §§ 3663–3664. We review de novo the legality of the district court's order of restitution, and we review for clear error any underlying factual findings. *United States v. Guthrie,* 64 F.3d 1510, 1514 (10th Cir.1995). The amount of restitution ordered pursuant to a legal restitution order we review for an abuse of discretion, *id.,* and "a sentencing court has wide discretion to fashion an appropriate sentence for an individual defendant." *United States v. Harris,* 7 F.3d 1537, 1540 (10th Cir.1993). However, "[a] sentencing court may not order restitution under the VWPA in an amount greater than the total loss caused by a defendant's conduct." *Id.* at 1539.

We hold that the district court did not err in ordering Mr. Spring to pay the full amount of restitution to Bank One. Mr. Spring was ordered to make restitution jointly and severally with Mr. Monitz. Joint and several liability means that one of the two defendants (either Mr. Spring or Mr. Monitz) could be liable for the entire amount. The record on appeal does not contain any documentation concerning Mr. Monitz's convictions. The parties, however, have represented that he was convicted and sentenced by a Utah state court, presumably of robbing some or all of the Utah banks involved in this conspiracy. The government has also represented to us that the Utah state court did not order him to make restitution to Bank One in Colorado, as it presumably could not. Thus, the court did not err in making Mr. Spring liable for the entire loss suffered by Bank One. *See Harris,* 7 F.3d at 1539–40 (holding

no error where the court made a defendant "potentially liable for the full amount of restitution while ordering his codefendant to be liable for only one-half of the total amount"). Of course, as we have stated, Bank One may not in fact recover more than the amount it lost. Thus, to the extent Mr. Monitz ever makes full or partial restitution to Bank One, pursuant to the order of a court with jurisdiction to make such an order, Mr. Spring may not be required to pay the full amount now assessed against him.

## VI. *Effect of Bailey on One § 924(c) Conviction*

Mr. Spring was convicted on count eleven of aiding and abetting Mr. Monitz in the using or carrying of a firearm during and in relation to the conspiracy to commit bank robbery. The count and conviction arose from the fact that when Mr. Spring and Mr. Monitz were arrested on August 11, 1993, while traveling in a car, a firearm was found inside a fanny pack which was inside a gym bag which was in the back of the car behind the driver's seat. R. Vol. XVII at 414–15. Additionally, there was testimony that officers had, earlier that day, observed Mr. Spring drive Mr. Monitz around to various banks in Ogden, Utah, where Mr. Monitz would leave the car and enter the banks wearing the fanny pack later discovered to contain the firearm. R. Vol. XVI at 385–392.

The district court instructed the jury that it had to find, *inter alia*, that during and in relation to the conspiracy Mr. Monitz knowingly used or carried the firearm and that Mr. Spring aided and abetted Mr. Monitz in the use or carrying of the firearm. Jury Instruction No. 68; R. Supp. Vol. II at Tab 139. The court defined "using or carrying" as "having a firearm readily available to assist or aid in the commission of the alleged underlying crime of violence." Jury Instruction No. 70; *Id.* The court further instructed the jury that "[i]t is not necessary for the government to show that ... Monitz fired, brandished or displayed the firearm during the underlying crime of violence." *Id.* This definition was correct under our interpreta-

tion of § 924(c) at the time the instruction was given.

While this appeal was pending, the Supreme Court decided *Bailey v. United States*, —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), in which the Court held that "use" in § 924(c)(1) means that the defendant must have "actively employed the firearm during and in relation to the predicate crime." *Id.* at ——, 116 S.Ct. at 509; *see also United States v. Wacker*, 72 F.3d 1453, 1463–64 (10th Cir.1995). Mr. Spring argues that *Bailey* requires reversal of his conviction on count eleven.

■■■ Both parties agree that the district court's definition of "use" is incorrect under *Bailey*. The government concedes that the evidence is insufficient, as a matter of law, to support a conviction under the "use" prong of § 924(c)(1). The government argues, however, that the Tenth Circuit's definition of "carry" has been undisturbed by *Bailey*, and, although the court did not provide a complete definition of "carry," no objection was made to it and, moreover, the evidence proved beyond a reasonable doubt that Mr. Monitz "carried" the firearm under the still-viable definition of "carry."

We normally review for plain error jury instructions to which, as here, no objection was made. *United States v. Barber*, 39 F.3d 285, 287–88 (10th Cir.1994). We have a somewhat unusual situation here, however, because an intervening change in the law— the *Bailey* decision—has rendered a jury instruction which was at least largely correct at the time partially incorrect now.

We first consider whether *Bailey* sheds any light on the appropriate definition of "carry" for § 924(c)(1) purposes. We agree with the Sixth Circuit, which recently observed that *Bailey* "provides some guidance regarding the correct application of the 'carry' prong of section 924(c)(1)." *United States v. Riascos–Suarez*, 73 F.3d 616, 623 (6th Cir.1996). *Bailey* suggests that neither storage nor possession of a gun, without more, satisfies the "carry" prong of § 924(c)(1).[11]

---

11. As the *Riascos–Suarez* court observed:

In distinguishing "use" from "carry," the Court [in *Bailey*] commented that "[i]f Con-

Our circuit has described the ."carrying" element as involving "two elements: possession of the weapon through the exercise of dominion or control; and transportation of the weapon." *United States v. Martinez*, 912 F.2d 419, 420 (10th Cir.1990) (citing *United States v. Cardenas*, 864 F.2d 1528, 1535–36 (10th Cir.), *cert. denied*, 491 U.S. 909, 109 S.Ct. 3197, 105 L.Ed.2d 705 (1989)); *see United States v. Nicholson*, 983 F.2d 983, 990 (10th Cir.1993) (defendant carried weapon where he had "dominion and control" over the gun); *United States v. McDonald*, 933 F.2d 1519, 1526 (10th Cir.) (defendant carried firearm where he had "easy and quick access" to it and he knew it was there), *cert. denied*, 502 U.S. 897, 112 S.Ct. 270, 116 L.Ed.2d 222 (1991). *See also United States v. Hernandez*, 80 F.3d 1253, 1257 (9th Cir. 1996) (post-*Bailey* case defining carrying as requiring the defendant to have "transported the firearm on or about his or her person.... This means the firearm must have been immediately available for use by the defendant."); *Riascos–Suarez*, 73 F.3d at 623 (post-*Bailey* case defining carrying as requiring that "the firearm ... be immediately available for use—on the defendant or within his or her reach").

■ We agree with the government that under our definition, even in light of *Bailey*, the court's instructions were generally correct, although incomplete. Thus, because Mr. Spring made no objection to the definition of "carry" in that instruction, we review only for plain error. *Barber*, 39 F.3d at 287–88. "Rule 52(b) grants an appellate court the authority to correct 'an "error" that is "plain" and that "affects substantial rights." ' " *United States v. Gomez*, 67 F.3d 1515, 1520 (10th Cir.1995) (quoting *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993)). To warrant correc-

tion on appeal, the error must be one which "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732, 113 S.Ct. at 1776 (internal quotations and citations omitted.).

The government argues the evidence overwhelmingly shows that Mr. Spring aided and abetted Mr. Monitz in "carrying" the weapon under our circuit's definition of "carry." Therefore, no plain error occurred. As Mr. Spring points out, we have, with little discussion, remanded several cases for reconsideration in light of *Bailey*. *See United States v. Oporto*, 1996 WL 6566 (10th Cir. Jan. 9, 1996) (defendant convicted of carrying and using); *United States v. Ross*, 1996 WL 6600 (10th Cir. Jan. 9, 1996) (defendant convicted of use). We also remanded for a new trial where a defendant had been charged with "use" of a firearm. *See United States v. Wacker*, 72 F.3d 1453, 1464–65 (10th Cir. 1995). We observed that while the "evidence ... was sufficient to support a conviction for use of a firearm under our then-existing standard ... we cannot say how a jury might decide this issue if properly instructed under the law as defined by *Bailey*." We went on to state that "[t]he question of whether Edith Wacker's gun was 'used' under section 924(c) is best left to the determination of a properly instructed jury." *Id.* at 1465.[12] The Sixth Circuit recently vacated a § 924(c)(1) conviction and remanded for further proceedings where the jury was given instructions very similar to the ones in this case:

Our pre-*Bailey* definition of "use" was so broad that neither party had a reason to focus on the factual issues relevant to the "carry" prong, i.e., immediate availability and physical transportation. More important, the evidence and jury instructions allowed the jury to convict even if it believed that there was no gun within Moore's reach, or that Moore had not

---

gress had intended to deprive 'use' of its active connotations, it could have simply substituted a more appropriate term—'possession'—to cover the conduct it wished to reach." —— U.S. at ——, 116 S.Ct. at 508. The Court went on to say, "[a] defendant cannot be charged under section 924(c)(1) merely for storing a weapon near drugs or drug proceeds. Storage of a firearm, without its more active employ-

ment, is not reasonably distinguishable from possession."
*Riascos–Suarez*, 73 F.3d at 623.

12. In *Wacker* we noted that "[b]ecause none of the appellants here were charged under the 'carry' prong of that statute, we need not remand this issue to the district court." *Wacker*, 72 F.3d at 1464 n. 8.

1466

physically transported any gun during and in relation to his drug trafficking crime. *In fact, the jury instructions drew no distinction between "use" and "carry" at all. United States v. Moore,* 76 F.3d 111, 113 (6th Cir.1996) (emphasis added). *Cf. United States v. Price,* 76 F.3d 526, 529 (3d Cir. 1996) (holding erroneous jury instruction on "use or carry" harmless error where the fact that co-defendant "both 'used' and 'carried' the firearm within the statutory meaning is perfectly clear").[13]

In this case, count eleven was based upon the confiscation of a firearm inside a fanny pack inside a gym bag behind the driver's seat of the car in which Mr. Spring drove Mr. Monitz, coupled with the testimony of police officers that Mr. Monitz was seen, on several occasions, leaving the car driven by Mr. Spring and entering various banks wearing the fanny pack. We think that the instructions in this case, like in *Moore,* did not focus the jury, or the parties, on the elements of "carrying" a firearm. Indeed, as in *Moore,* no distinction was drawn between use and carry. And this is not a case, like *Price,* in which the evidence is "overwhelming" that the defendant aided and abetted in the "carrying" of a firearm. Rather, the evidence suggests that *Mr. Monitz* carried a firearm. Whether it proves beyond a reasonable doubt that *Mr. Spring* aided and abetted in such carrying is less clear. *Cf. Price,* 76 F.3d at 529 (finding evidence clear that defendant aided and abetted when he "probably knew in advance, and most certainly knew at the time, what [his fellow robber] was doing.").

We conclude that we must reverse Mr. Spring's conviction on count eleven, and remand for a new trial on that count. The jury instruction did not focus the jury's attention on the elements of the "carry" prong of § 924(c)(1), and we cannot say with certainty

that a properly and fully instructed jury would have found Mr. Spring guilty of aiding and abetting in the carrying of a firearm. Thus, we conclude that the incomplete instruction on "carry" was plain error, warranting a reversal and remand of count eleven.

## CONCLUSION

For the foregoing reasons, we AFFIRM Mr. Spring's conviction and sentence in all respects, except that we REVERSE his conviction on count eleven and remand for a new trial on that count. The pending motion to stay the restitution order pending review of the merits of the case is denied as moot.

---

**13.** In *Price,* both Mr. Price and another individual, Mr. Stubbs, entered a bank and, while Mr. Stubbs "brandish[ed]" a gun, Mr. Price collected money. Mr. Price was charged with both using and carrying a firearm during and in relation to the bank robbery, as well as aiding and abetting, both in violation of § 924(c)(1). In concluding that the jury instruction on "use or carry," incorrect in light of *Bailey,* was harmless error, the court observed that the evidence was such that the jury "inevitabl[y] ... found that Mr. Price

was one of the masked men who robbed the bank, and, more specifically, that he was the man who jumped over the counter and collected the money while Mr. Stubbs was brandishing the gun." *Price,* 76 F.3d at 529. The court went on to state, "[t]hat Mr. Stubbs both 'used' and 'carried' the firearm within the statutory meaning is perfectly clear," and found that the evidence that Mr. Price aided and abetted that use and carrying was "overwhelming." *Id.*