**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 18 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

WAYNE PEDERSON, a/k/a Robert
Michael Pallmer,

Defendant-Appellant.

No. 97-1245
(D.C. 95-CR-367-S)
(District of Colorado)

**ORDER AND JUDGMENT** *

Before **HENRY** , **BARRETT** , and **BRISCOE** , Circuit Judges.

Mr. Pederson appeals his convictions for: 1) interference with commerce by threats or violence; 2) interstate travel or transportation in aid of racketeering enterprises; and 3) use of interstate communications to extort money. The sole issue on appeal is whether the district judge erred in excluding testimony under Fed. R. Evid. 804(b)(3) for lack of corroboration. A determination of the

---

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th     Cir. R. 36.3.

sufficiency of corroborating evidence under Rule 804(b)(3) is within the sound discretion of the trial court.    United States v. Spring   , 80 F.3d 1450, 1461 (10th Cir. 1996).  Finding no abuse of discretion, we affirm.

## I.  STATEMENT OF THE CASE

Tom Carey, a broker, asked Mr. Pederson if he could temporarily place some stock in Mr. Pederson's account.  Mr. Pederson agreed, with the understanding that he was only required to hold onto the stock until payment was due, at which point someone would remove it from his account.  In return for this favor to Mr. Carey, Mr. Pederson was to receive several shares of the stock plus a stock tip.

The stock was not removed from Mr. Pederson's account on schedule, and a brokerage firm in La Jolla, California demanded payment from Mr. Pederson. Mr. Carey told Mr. Pederson that he would work out the problem with some brokers in Denver.  In the meantime, Mr. Carey told Mr. Pederson to seek a payment extension.  Mr. Carey then convinced Mr. Pederson that he would double his money if he invested in Star Casino stock.  This stock was being advertised by Louis Scotti and Craig Edelmann, who were with the Denver firm of Christopher Winston & Co.  Acting upon this tip, Mr. Pederson purchased $26,800 worth of Star Casino stock.

Mr. Pederson ended up losing approximately $10,000 when he eventually had to pay for the stock that Mr. Carey had placed in his account. In addition, he was forced to sell the Star Casino stock at a drastic loss to obtain funds to pay other debts. According to the government, Mr. Pederson lost a total of $32,000.

Mr. Pederson attempted to contact Mr. Scotti and Mr. Edelmann, the Denver brokers who he believed were responsible for failing to remove the stock from his account, and who Mr. Pederson blamed for his loss on the Star Casino stock. However, he was unable to reach them directly or through Mr. Carey. He, therefore, hired two men, Octavio Romero and Fred Rousseau, to travel to Denver to collect the money that he thought Mr. Scotti and Mr. Edelmann owed him.

At some point before Mr. Romero and Mr. Rousseau left for Denver, Mr. Carey provided Mr. Pederson with information about Mr. Scotti and Mr. Edelmann, including: 1) their home addresses and telephone numbers; 2) descriptions of their cars; 3) their license plate numbers; 4) their marital statuses; and 5) the schools their children attended. Mr. Pederson passed this information along to Mr. Romero. Mr. Rousseau testified that Mr. Pederson told him to kill Mr. Scotti and Mr. Edelmann if that was necessary to get his money back.

After Mr. Romero and Mr. Rousseau made an unsuccessful attempt to collect money from Mr. Scotti and Mr. Edelmann in Denver, Mr. Rousseau

3

introduced Mr. Pederson to a man who called himself "Johnny Blaze." Mr. Pederson testified that he thought Mr. Blaze was a professional debt collector. Rec. vol. VIII at 737-38. Mr. Pederson hired Mr. Blaze and gave him money to finance a trip to Denver. Mr. Rousseau and various others traveled to Denver with Mr. Blaze to assist in collecting the money.

Once in Denver, Mr. Blaze and his cohorts went to Mr. Scotti's home, forced their way in, and locked the door. Mr. Scotti, his wife, and his children were home at the time. At various times during the encounter, Mr. Blaze held a gun to Mr. Scotti's throat and abdomen. Mr. Blaze told Mr. Scotti that he was there to collect $125,000 and that if Mr. Scotti did not pay, his wife would be raped and his children would be skinned. Mr. Scotti told the men that he needed to get to his office to have the money wired. Mr. Blaze went with Mr. Scotti, and several others stayed behind to prevent Mr. Scotti's wife from calling the police.

On the way to Mr. Scotti's office, Mr. Blaze punched Mr. Scotti in the ribs. Once they arrived at the office, Mr. Blaze stole $12,000 in cash from a safe. At some point during the encounter, Mr. Edelmann arrived at the office. He and Mr. Scotti convinced a friend in Phoenix to lend them $50,000. Mr. Blaze told them to have the money wired to a bank account in Chicago. The Chicago bank account was in Mr. Pederson's control. Mr. Pederson admitted that he told Mr. Blaze to have the money wired to that account. Rec. vol. VIII at 784.

4

Mr. Scotti and Mr. Edelmann made tentative arrangements to wire the remainder of their alleged $125,000 debt as soon as they could, and Mr. Blaze left Denver. Two days later, Mr. Scotti and Mr. Edelmann went to the FBI. The FBI began recording various telephone conversations among Mr. Scotti, Mr. Edelmann, Mr. Blaze, and Mr. Pederson. Mr. Carey subsequently became a government informant, and the FBI recorded several of his conversations with Mr. Pederson as well.

The evidence at trial showed that virtually every time Mr. Blaze made phone contact with either Mr. Scotti or Mr. Edelmann concerning the remainder of the $125,000, he immediately thereafter placed a call to Mr. Pederson. At trial, Mr. Pederson admitted that he was in contact with Mr. Blaze during the days in question. However, he claimed that he told Mr. Blaze to collect the money in a non-threatening manner that would not involve the police. He claimed that Mr. Blaze was out of control.

Law enforcement authorities eventually arrested Mr. Blaze in Hawaii. A grand jury returned an indictment charging Mr. Blaze, Mr. Pederson, and others with various crimes involving extortion, racketeering, and money laundering. In jail awaiting trial, Mr. Blaze met a man named Raymond Cisneros. According to Mr. Pederson, Mr. Blaze confessed to Mr. Cisneros that the manner in which he attempted to obtain money from Mr. Scotti and Mr. Edelmann was all his idea

5

and that he was not acting at Mr. Pederson's direction.

## II. DISCUSSION

At trial, the defense called Mr. Cisneros, who would have testified as to what Mr. Blaze allegedly told him in jail. The defense proffered Mr. Cisneros's testimony under the hearsay exception contained in Fed. R. Evid. 804(b)(3). According to Rule 804(b)(3), if the declarant is unavailable as a witness, the following is not excluded as hearsay:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

"A defendant seeking to admit hearsay evidence under Rule 804(b)(3) to exculpate himself must show '(1) an unavailable declarant; (2) a statement against penal interest; and (3) sufficient corroboration to indicate the trustworthiness of the statement.'" Spring, 80 F.3d at 1460-61 (quoting United States v. Porter, 881 F.2d 878, 882 (10th Cir. 1989)). The parties stipulated to the unavailability of Mr. Blaze, the declarant. In addition, the government conceded that the statement was against Mr. Blaze's penal interest. The

6

government, however, objected to the testimony on the ground that it was not corroborated. The district court agreed and excluded Mr. Cisneros's testimony.

Mr. Pederson argues that Mr. Blaze's statement was sufficiently corroborated, and, therefore, the district court abused its discretion in excluding Mr. Cisneros's testimony. He argues that his case is analogous to United States v. Lopez, 777 F.2d 543 (10th Cir. 1985). In Lopez, two men, Mr. Lopez and Mr. Jaramillo, were indicted for possession with intent to distribute a controlled substance when officers found packages of cocaine in the car they were driving. Mr. Jaramillo, who later jumped bail and became a fugitive, told his attorney that Mr. Lopez did not know there was cocaine in the vehicle. In other words, Mr. Jaramillo took responsibility for placing the cocaine in the car, and he stated that he never discussed it with Mr. Lopez. Id. at 554.

Mr. Lopez proffered the testimony of Mr. Jaramillo's lawyer pursuant to Rule 804(b)(3). The district court excluded the testimony, and this court reversed. We found that Mr. Jaramillo, the declarant, was unavailable, that the statement was against his penal interest, and that the statement was sufficiently corroborated. Id. We rested our finding of corroboration on the fact that a fingerprint expert testified that Mr. Jaramillo's fingerprints were on the packages of cocaine, but Mr. Lopez's fingerprints were not. Id. We think, however, that Lopez is distinguishable from the case at bar. Unlike the fingerprint evidence in

7

Lopez, here there is scant, if any, corroborating evidence.

In fact, the great weight of the evidence belies Mr. Pederson's claim that Mr. Blaze's statement is sufficiently corroborated. First of all, it was Mr. Pederson's money that was lost, not Mr. Blaze's. Thus, Mr. Pederson, not Mr. Blaze, had the incentive to resort to extreme measures to recover the money. Moreover, Mr. Pederson was the one who hired Mr. Romero to collect the money, and, when that failed, he hired Mr. Blaze. According to Mr. Rousseau, Mr. Pederson told him, "I don't care if you put these people on ice" as long as he recovered the money. Rec. vol. V at 287. Furthermore, Mr. Scotti and Mr. Edelmann were directed to have the money wired to an account that was in Mr. Pederson's control.

In addition, telephone records indicate that virtually every time Mr. Blaze called Mr. Scotti and Mr. Edelmann, he then placed a call to Mr. Pederson, presumably for further direction. See Addendum to Aple's Answer Brief at 253-56. Likewise, transcripts of taped telephone conversations show that Mr. Pederson was in control of the extortion. In a telephone conversation with Mr. Carey, Mr. Pederson said that he would send Mr. Blaze [1] back to Denver if Mr. Edelmann would not give the money to Mr. Carey. Id. at 148. In a telephone

_____

[1]Mr. Blaze used the name "Carl" during his trip to Denver and throughout his dealings with Mr. Scotti and Mr. Edelmann.

8

conversation with Mr. Edelmann, Mr. Pederson stated "[Carl] works for me." Id. at 163.  During the same conversation, Mr. Edelmann expressed misgivings about giving the money to Mr. Carey rather than Mr. Blaze, for fear that Mr. Blaze would return to Denver.  Mr. Pederson responded that he would "take the pressure off with Carl" once Mr. Edelmann surrendered the money to Mr. Carey. Id. at 164.

Mr. Pederson draws the Court's attention to several circumstances that he claims tend to corroborate Mr. Blaze's purported statement.  First of all, Mr. Cisneros would have testified that Mr. Blaze repeated the statement to him on another occasion.  Secondly, Mr. Pederson's own testimony is consistent with Mr. Blaze's alleged statement.  Finally, Mr. Blaze allegedly made his statement before he pled guilty, and he had no reason to lie.

In light of the overwhelming weight of the evidence tending to prove that Mr. Pederson was in control of the extortion, we do not think that these circumstances meet Mr. Pederson's burden of showing sufficient corroboration to indicate the trustworthiness of Mr. Blaze's alleged statement.  In short, we think the district court was well within its discretion when it ruled that Mr. Cisneros's testimony was inadmissible. Accordingly, we AFFIRM the judgment of the district court.

Entered for the Court,

9

Robert H. Henry
Circuit Judge