FILED
United States Court of Appeals
Tenth Circuit

June 24, 2009

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

STEVE NATHANIEL JACKSON,

    Defendant - Appellant.

No. 07-2212
(D. N.M.)
(D.Ct. No. 2:06-CR-01795-RB)

**ORDER AND JUDGMENT**[*]

Before **TACHA**, **LUCERO**, and **O'BRIEN**, Circuit Judges.

A jury convicted Steve Jackson of possession with intent to distribute crack cocaine. He was sentenced to life imprisonment. He claims the district court infringed upon his right to present a defense by permitting one of his potential witnesses, Joseph Armstrong, to invoke the Fifth Amendment privilege against self-incrimination and refuse to testify. He also claims that error was compounded when the court refused to admit Armstrong's out-of-court statements

---

[*] This order and judgment is not binding precedent. 10th Cir. R. 32.1(A). Citation to orders and judgments is not prohibited. Fed. R. App. 32.1. But it is discouraged, except when related to law of the case, issue preclusion or claim preclusion. Any citation to an order and judgment must be accompanied by an appropriate parenthetical notation -- (unpublished). 10th Cir. R. 32.1(A).

exculpating Jackson.  We affirm.

## I.  FACTUAL BACKGROUND

On May 18, 2006, New Mexico Probation and Parole Officers Mark Cubillos and Riley Loomis, accompanied by officers from state and local law enforcement agencies, were conducting home visits of probationers and parolees in Hobbs, New Mexico.  One of the parolees was Jackson, who had informed the probation office he resided at 203 South Douglas but often stayed with his girlfriend across the street at 208 South Douglas.  Loomis and several officers went to 203 South Douglas while Cubillos and other officers went to 208 South Douglas.

At the 203 South Douglas address, Loomis was approached by Ruby Patterson, Jackson's aunt.  Patterson said Jackson was not there; he had not stayed there the previous night; she did not know where he was staying; and "he hadn't been staying there for a while."  (Appellant's App. Vol. II at 163.)  Loomis and the officers left and went to 208 South Douglas.

At 208 South Douglas, Cubillos knocked on the front door while other officers positioned themselves around the house.  Cubillos heard "quick movement" inside.  (*Id*. at 138.)  He knocked again and identified himself.  He continued to hear movement from within the house.  Cubillos continued to knock and identify himself for approximately seven more minutes.  Finally, Jackson opened the door.  Due to Jackson's delay in answering the door, the officers

decided to search the residence.[1]

In the kitchen officers discovered two sets of digital scales, one containing white flakes. In the kitchen trash, they found numerous baggies with their bottom corners removed, a razor blade cardboard (used to protect a razor blade's edge) and a pair of used latex gloves. In the master bedroom, they found several photographs of Jackson, mail addressed to Jackson at the 208 South Douglas address, as well as clothing for men, women and children. They also discovered a bag containing two unopened packages of sandwich baggies, two bags of latex gloves and an unopened box of razor blades. In the second bedroom, they found a baggie containing 7.9 grams of crack cocaine in the pocket of a men's jacket and a box of .380 caliber ammunition.

While walking through the hallway, New Mexico State Police Officer Timothy Argo noticed the ceiling door to the attic was not sitting properly inside its opening. Believing someone had recently entered the attic, Argo pushed the attic door up and moved it over. In doing so, he noticed a plastic bag hanging over the edge of the opening. When he grabbed the bag, a small baggie of crack cocaine fell to the floor. Other officers lifted Argo into the attic, where he discovered two plastic baggies containing smaller baggies of crack cocaine. A

---

[1] Cubillos testified Jackson's delay in opening the door was significant because in his experience "when someone takes awhile to answer the door, it usually means that they're trying to [hide or conceal] a probation [or parole] violation." (Appellant's App. Vol. II at 140.)

total of 206.8 grams of crack cocaine was seized from the attic. Jackson was arrested.

Four days later, on May 22, 2006, Armstrong signed an affidavit, prepared by Jackson's then-attorney, saying the cocaine found at 208 South Douglas was his, not Jackson's, and he stayed at the 208 South Douglas residence on "many occasions." (Appellant's App. Vol. I at 32.) According to the affidavit, he understood he was subjecting himself to potential prosecution but he could not "let another person go to prison for something that belonged to [him.]" (*Id.*)

On August 24, 2006, four agents from the Drug Enforcement Administration (DEA) and the Lea County New Mexico Drug Task Force interviewed Armstrong. Armstrong initially said the cocaine found at 208 South Douglas belonged to him but eventually recanted, saying the cocaine did not belong to him and he was only trying to help Jackson. He said he had been friends with Jackson for a long time and considered Jackson to be family. Although he was not promised anything specific for claiming the cocaine belonged to him, Armstrong believed Jackson would "take care of him." (*Id*. at 34.) When asked what he would say if placed under oath by a judge, Armstrong admitted he would say the cocaine did not belong to him.

On October 31, 2006, Armstrong again changed his story, this time in a videotaped statement taken in the office of Jackson's current attorney. Armstrong, who was not placed under oath or subject to cross examination, said

the cocaine found inside the 208 South Douglas residence belonged to him. The residence was owned by Jackson's grandmother but he had been staying there since 2000 or 2001 with the permission of Jackson's sister. He did not know who owned the jacket containing the crack cocaine. He was distantly related to Jackson and they were close.

When asked whether he was aware both crack and powder cocaine were found, Armstrong responded there was "hard and cut up" cocaine. (R. Videotape at 5:50-51.) He claimed the government agents interviewing him (on August 24) told him they were leaving with him or "the truth." (*Id*. at 6:27.) He believed the statement meant they were going to arrest him. He knew the videotape was being prepared for trial and he could be prosecuted for his statement but did not want an innocent man to be punished. Armstrong claimed he was not forced or threatened to make the statement and would be willing to testify at trial.

## II. PROCEDURAL BACKGROUND

Jackson was indicted with possession with intent to distribute fifty grams and more of crack cocaine and aiding and abetting in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The government filed an amended information alleging Jackson had previously been convicted of three felony drug convictions, which subjected him to a mandatory sentence of life imprisonment. Jackson filed a notice of intent to use Armstrong's affidavit and videotape statement at trial pursuant to the hearsay exceptions set forth in Rules 804(b)(3) and 807 of the

Federal Rules of Evidence. The government opposed the introduction of the statements. The district court concluded the statements were inadmissible hearsay and did not satisfy the requirements for admission under either Rule 804(b)(3) or Rule 807 because Jackson failed to provide sufficient corroboration of their trustworthiness. It also determined Armstrong's statements did not necessarily exculpate Jackson—even if Armstrong owned the crack cocaine, Jackson could have knowingly possessed it.

Jackson subpoenaed Armstrong to testify at Jackson's trial. Prior to the start of trial, Armstrong's attorney informed the court Armstrong would be invoking his Fifth Amendment right to remain silent. Jackson objected, arguing Armstrong did not have the right to invoke the Fifth Amendment privilege because he had already inculpated himself in the affidavit and videotape statement. The court placed Armstrong under oath and advised him of his right to remain silent:

> THE COURT: Mr. Armstrong, the United States Constitution/New Mexico Constitution gives you the right not to say anything under oath that might subject you to criminal exposure, criminal penalties, to incriminate yourself. Have you talked about that right with [your attorney]?
>
> THE WITNESS: Yes, I've talked about it.
>
> THE COURT: And do you understand the nature of that right?
>
> THE WITNESS: I believe so.
>
> THE COURT: And do you understand that if you say something here

-6-

this morning under oath that could result in your . . . own criminal liability. Is that clear?

THE WITNESS: Yes, sir.

THE COURT: And, of course, with criminal liability comes the possibility of a jail sentence, a probationary sentence, fines, any - any of those things. Do you understand?

THE WITNESS: Yes, sir.

THE COURT: And do you have any questions about your right to invoke the Fifth Amendment?

THE WITNESS: No, sir.

(Appellant's App. Vol. II at 93-94.)

Jackson objected, claiming this admonition, combined with the agents informing Armstrong he would be arrested if he did not tell "the truth," were coercive and interfered with Armstrong's right to decide whether or not to testify. In response, the court informed Armstrong that by explaining to him his rights, its intent was not to influence Armstrong's decision whether to testify:

THE COURT: [T]here was certainly no intent on my part to coerce you . . . one way or the other about how you testify this morning. It's my obligation to inform you of your right not to testify at this point. And it was my belief that in order to fully inform you of what that right against self-incrimination means, that I ought to tell you what the potential consequences would be.

I didn't intend to coerce you, threaten you, twist your arm, or do anything else. And certainly, you've had the right to counsel . . . before today . . . and during this hearing. So do you, at this point, feel fully informed of your rights?

THE WITNESS: Yes, sir. I wish not to answer any more questions.

(*Id*. at 97.)  When asked whether Armstrong would testify if he were called as a witness at trial, Armstrong stated he would invoke his right to remain silent.  The court accepted Armstrong's invocation of the Fifth Amendment privilege.  At all times during this exchange, Armstrong had independent counsel present to assist him.

Jackson renewed his request to submit Armstrong's affidavit and videotape statement, claiming they were crucial to his defense.  The court again denied the request.

## III.  DISCUSSION

Jackson says the district court infringed upon his constitutional right to present a defense by allowing Armstrong to invoke his Fifth Amendment right to remain silent.  In the alternative, he claims the court erred in excluding Armstrong's affidavit and videotape statement because they were admissible under Rules 804(b)(3) and 807 of the Federal Rules of Evidence.

A.   Invocation of Fifth Amendment Right

Armstrong inculpated himself in his affidavit and the videotape statement.  Excluding that evidence, Jackson says, vitiates his right to a fair trial.  He also alleges the government substantially interfered with Armstrong's decision whether to testify.

Whether a witness may properly invoke the Fifth Amendment privilege against self-incrimination is a question of law we review de novo.  *United States*

*v. Rivas-Macias*, 537 F.3d 1271, 1278 (10th Cir. 2008), *cert. denied*, 129 S. Ct. 1371 (2009). We also review de novo a claim that the government violated a defendant's constitutional right to present a defense. *United States v. Serrano*, 406 F.3d 1208, 1214 (10th Cir. 2005).

### 1. *Effect of Affidavit and Videotape Statement*

A criminal defendant has a constitutional right to present a defense, including the right to present witnesses, and such right is "essential to a fair trial." *Id*. at 1214-15. However, that right, while fundamental, is not absolute. *Rivas-Macias*, 537 F.3d at 1278. In certain cases, "a defendant's right to present a defense must bow to accommodate legitimate, competing interests in the criminal trial process." *Id*. One of these interests is the Fifth Amendment privilege of a witness not to incriminate himself. *Id*. For the privilege to apply, however, the witness "must face some authentic danger of self-incrimination." *Id*. at 1277 (quotations omitted). "The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself . . . . It is for the court to say whether his silence is justified and to require him to answer if it clearly appears to the court that he is mistaken." *Hoffman v. United States*, 341 U.S. 479, 486 (1951) (citation and quotations omitted).

The protection against self-incrimination afforded by the Fifth Amendment should be liberally construed. *Id*. It "extends to answers that would in themselves support a conviction under a federal criminal statute [and] those which

-9-

would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." *Id*. "Not much is required, therefore, to show an individual faces some authentic danger of self-incrimination, as the privilege extends to admissions that may only tend to incriminate." *Rivas-Macias*, 537 F.3d at 1278 (citation and quotations omitted). "[W]e will uphold an individual's invocation of the [Fifth Amendment] privilege against self-incrimination unless it is perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken and his answers could not possibly have a tendency to incriminate." *Id*. at 1278-79 (quotations omitted).

*Mitchell v. United States*, 526 U.S. 314 (1999), is informative. Mitchell pled guilty to various drug charges while reserving the right to contest at sentencing the drug quantity attributable to her on the conspiracy charge. At sentencing, three co-defendants testified Mitchell's actions in the conspiracy involved over five kilograms of cocaine. The government also introduced the trial testimony of the confidential informant, who said she purchased cocaine from Mitchell three times and those purchases involved a total of less than five kilograms of cocaine. Mitchell neither testified nor produced other evidence to rebut the government's evidence. Instead, she argued the three sales to the confidential informant constituted the only sufficiently reliable evidence of drug quantity. Holding Mitchell's silence against her, the district court credited the testimony of the three co-defendants which mandated a minimum sentence of ten

years imprisonment.  The Third Circuit affirmed, concluding Mitchell had waived her Fifth Amendment privilege by pleading guilty.  *Id*. at 320.  The Supreme Court reversed.  It held Mitchell retained her Fifth Amendment privilege at sentencing despite her guilty plea.  In so holding, the Court rejected "the idea that the entry of the guilty plea completes the incrimination of the defendant, thus extinguishing the privilege."  *Id*. at 325.  It reasoned:

> It is true, as a general rule, that where there can be no further incrimination, there is no basis for the assertion of the privilege.  We conclude that principle applies to cases in which the sentence has been fixed and the judgment of conviction has become final.  If no adverse consequences can be visited upon the convicted person by reason of further testimony, then there is no further incrimination to be feared.
>
> Where the sentence has not yet been imposed a defendant may have a legitimate fear of adverse consequences from further testimony.

*Id*. at 326 (citation omitted).

Similarly, in *Rivas-Macias*, co-defendant Jimenez invoked his Fifth Amendment privilege at Rivas-Macias' trial.  Rivas-Macias claimed the privilege was not available because Jimenez had already pled guilty and given several unsworn debriefing statements to the government.  We concluded Rivas-Macias had failed to show Jimenez's testimony at trial would not have had any tendency to further incriminate him.  537 F.3d at 1279.  Relying on *Mitchell*, we determined that because Jimenez had yet to be sentenced, he faced an authentic danger of further incriminating himself.  *Id*.  We further concluded Jimenez had

-11-

not waived his Fifth Amendment privilege by providing the unsworn debriefing statements because those statements were not made in the same proceeding in which Rivas-Macias sought to compel Jimenez to testify, *i.e.*, Rivas-Macias' trial. *Id*. at 1280.

Here, even though Armstrong made incriminating statements in his affidavit and videotape statement, he has not yet been prosecuted, convicted or sentenced based on those statements. Therefore, the mere fact he made the statements does not eliminate the possibility that his testimony at trial would tend to further incriminate him. For instance, while he admitted he owned the cocaine found at the residence, testimony concerning other aspects of the offense, including the amount of cocaine, the extent of his involvement in its distribution and whether other individuals were involved, could have exposed Armstrong to more serious charges and greater penalties.[2] Nor did Armstrong waive his Fifth Amendment privilege by signing the affidavit and making the videotape statement. These statements did not occur during the same proceeding in which Jackson sought to compel Armstrong to testify, *i.e.*, Jackson's trial. *Id*. at 1280 ("A witness' testimonial waiver of the privilege is only effective . . . if it occurs in the same proceeding in which a party desires to compel the witness to

---

[2] And testimony concerning these other issues would have been required once Armstrong chose to testify. *See Mitchell*, 526 U.S. at 321 ("It is well established that a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details.").

testify.").

The court properly allowed Armstrong to invoke his Fifth Amendment privilege.

### 2. *Government Interference*

The government violates a defendant's right to due process if it substantially interferes with a defense witness' decision whether to testify. *Serrano*, 406 F.3d at 1215. Whether a due process violation has occurred must be decided on a case-by-case basis. *Id.* at 1216. "The dispositive question . . . is whether the government actor's interference with a witness's decision to testify was substantial." *Id.* (quotations omitted). "Interference is substantial when the government actor actively discourages a witness from testifying through threats of prosecution, intimidation, or coercive badgering." *Id.* However, "[t]he potential for unconstitutional coercion . . . significantly diminishes . . . if a defendant's witness elects not to testify after consulting an independent attorney." *Id.*

Here, Jackson concedes the district court could warn Armstrong about the consequences of testifying. Nevertheless, he asserts the agents' comments to Armstrong that his testimony could result in a jail sentence, combined with the four agents' threats to leave with Armstrong or the truth, substantially interfered with Armstrong's decision whether to testify. The district court was not persuaded; neither are we.

As conceded, a court has the discretion to admonish a witness about the

-13-

possibility of self-incrimination. *See United States v. Smith*, 997 F.2d 674, 680 (10th Cir. 1993). A due process violation occurs only if the court's admonition is threatening or employs coercive language or if the court actively encourages or badgers a witness not to testify. *Webb v. Texas*, 409 U.S. 95, 97-98 (1972); *Smith*, 997 F.2d at 680. The admonition in this case did none of those things. Rather, it informed Armstrong of his right not to testify and of the potential consequences he faced. Moreover, the court expressly told Armstrong its intent in giving the admonition was not to influence his decision whether to testify.

The agents who interviewed Armstrong also did not substantially interfere with his decision whether to testify. The agents allegedly told Armstrong they were either leaving with Armstrong (*i.e.*, arresting him) or the truth (*i.e.*, a statement that the drugs did not belong to Armstrong). Assuming this statement was in fact made, it occurred over six months before Armstrong decided to invoke his Fifth Amendment privilege. Due to this significant lapse of time, it is unlikely Armstrong's decision not to testify was the product of the agents' conduct. And, more important, Armstrong did not invoke his Fifth Amendment privilege until after conferring with independent counsel. His decision not to testify was "insulated from . . . governmental [coercion] by the independent and neutral advice of counsel." *Serrano*, 406 F.3d at 1216. Even considering the possible cumulative effect of the court's admonition and the agents' alleged statements, we see no due process violation in light of the insulating quality of

-14-

consultation with independent counsel.

B.  Rules 804(b)(3) and 807

Assuming Armstrong's invocation of his Fifth Amendment privilege was proper, Jackson contends the district court erred in prohibiting him from introducing into evidence Armstrong's affidavit and videotape statement.  He claims these items, although hearsay, were admissible under Rules 804(b)(3) and 807 of the Federal Rules of Evidence.

"The district court has broad discretion in determining the admissibility of evidence.  We therefore review a district court's decision to exclude evidence for abuse of discretion."[3]  *United States v. Solomon*, 399 F.3d 1231, 1239 (10th Cir. 2005) (citation omitted).  The affidavit and videotape statement are hearsay.  The question is whether they were admissible under an exception to the hearsay rule-in this case, Rule 804(b)(3) or Rule 807.

*1.  Rule 804(b)(3)*

Rule 804(b)(3) provides that statements against interest "are not excluded

---

[3] Jackson claims we should review the court's exclusion of the affidavit and videotape statement de novo because their exclusion affected his constitutional right to present a defense.  He is mistaken.  *See United States v. Adams*, 271 F.3d 1236, 1243 (10th Cir. 2001) (rejecting defendant's argument that we should review de novo rather than for an abuse of discretion the exclusion of evidence because it precluded his theory of defense, thereby violating his right to a fair trial and due process; "[the defendant] confuses a fundamental right, the right to present a theory of defense, with one that is not fundamental, the right to present that theory in whatever manner and with whatever evidence he chooses.")

-15-

by the hearsay rule if the declarant is unavailable as a witness." A statement against interest is:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. *A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.*

Fed. R. Evid. 804 (b)(3) (emphasis added).

"A defendant seeking to admit hearsay evidence under Rule 804(b)(3) to exculpate himself must show (1) an unavailable declarant; (2) a statement against penal interest; and (3) sufficient corroboration to indicate the trustworthiness of the statement." *United States v. Spring*, 80 F.3d 1450, 1460 (10th Cir. 1996) (quotations omitted). The government concedes Jackson has established the first two factors-Armstrong was "unavailable" when he properly invoked his Fifth Amendment privilege, *see* Fed. R. Evid. 804(a)(1); *see also United States v. Chalan*, 812 F.2d 1302, 1311 (10th Cir. 1987), and his statements that the cocaine belonged to him are clearly against his penal interest. The only question is whether Jackson provided sufficient corroboration of the trustworthiness of Armstrong's statements.

The district court concluded there was insufficient corroboration of trustworthiness. It considered the close relationship between Armstrong and

Jackson which provided a reason for Armstrong to help Jackson by claiming the drugs were his. *See United States v. Porter*, 881 F.2d 878, 883 (10th Cir. 1989) (considering close relationship between defendant and declarant in determining court did not abuse its discretion in concluding there was insufficient corroboration of trustworthiness). The court also considered the vagueness of Armstrong's on again, off again statements. Other than indicating the cocaine found in the home belonged to him, Armstrong did not identify the amount of cocaine, where it was located, how it was packaged or how it got to the house. Therefore, there was no way for the court to determine from Armstrong's statements whether the cocaine claimed by Armstrong was the same cocaine leading to the charges against Jackson. *See Spring*, 80 F.3d at 1461 (considering vagueness of declarant's statement concerning his involvement in robbery as indicative of its untrustworthiness). The court's decision to exclude Armstrong's statements was well within its discretion. *See id*. ("The determination of the sufficiency of . . . corroborating evidence lies within the sound discretion of the trial court, which is aptly situated to weigh the reliability of the circumstances surrounding the declaration.") (quotations omitted).

Jackson complains the court did not consider several facts: Armstrong was under oath when he made the statements; he was consistent when not threatened with arrest; he said he knew the search was conducted at the 208 South Douglas residence and both hard and cut up cocaine were found; and, finally, Jackson's

-17-

girlfriend said Armstrong was staying at the residence. He claims these facts sufficiently corroborate Armstrong's statements. Like the district court, we disagree.

While Armstrong's affidavit was allegedly made under oath, he was not under oath when he made the videotape statement. Armstrong also recanted his statement that the cocaine found in the 208 South Douglas residence belonged to him during his interview with the government agents. Although Jackson claims the recantation was the result of the agents threatening Armstrong with immediate arrest, the recantation really indicates Armstrong's willingness to say the drugs were his until faced with consequences. Armstrong's knowledge of the locus of the search, the 208 South Douglas residence, and the drugs found-both hard and cut up cocaine-does not corroborate his statement of ownership. Indeed, the latter statement, which was made on the videotape, contradicted his affidavit in which he averred both powder and crack cocaine were found in the residence, which in turn contradicted the evidence showing that only crack cocaine was found.

At trial Jackson's girlfriend testified Armstrong had stayed at the 208 South Douglas residence but her testimony does not sufficiently corroborate Armstrong's claimed ownership of the drugs found therein. This is especially true in light of the fact that items belonging to Jackson (photographs and mail) were discovered inside the residence and Jackson was at the residence when the cocaine was discovered. Jackson also told the probation department he often

-18-

stayed with his girlfriend at 208 South Douglas, listed that address on his driver's license, and between 1996 and 2006, provided that address to the police when stopped for traffic infractions.

The court did not abuse its discretion in concluding Armstrong's affidavit and videotape statement were not admissible under Rule 403(b)(3).

*2. Rule 807*

Rule 807, referred to as the residual hearsay exception, provides in relevant part:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Rule 807 should be used rarely and only in exceptional circumstances because to do otherwise would allow the exception to swallow the hearsay rule. *United States v. Tome*, 61 F.3d 1446, 1452 (10th Cir. 1993). Exceptional circumstances exist "where the court is satisfied that the evidence offers guarantees of trustworthiness and is material, probative and necessary in the interest of justice." *Id.* (quotations omitted). "Accordingly, the party offering the evidence bears a heavy burden of presenting the trial court with sufficient indicia of trustworthiness to trigger application of [the rule]." *United States v. Trujillo*,

136 F.3d 1388, 1396 (10th Cir. 1998).[4]

Relying on its Rule 804(b)(3) analysis, the district court determined Armstrong's statements lacked sufficient corroboration to be admissible under Rule 807. It also concluded Armstrong's statements were neither probative nor their admission essential to the interests of justice because they did not necessarily exculpate Jackson. Armstrong's ownership of the crack cocaine does not necessarily bear on whether Jackson knowingly possessed it with intent to distribute.

Admitting Armstrong's questionably reliable evidence without adversarial testing is a sobering prospect, requiring exacting care. We find no abuse of discretion. As stated above, Armstrong's statements lacked sufficient guarantees of trustworthiness. And the statements, while clearly implicating Armstrong, did not necessarily exculpate Jackson. In addition, Jackson was charged with aiding and abetting. Therefore, even assuming it was Armstrong not Jackson who possessed the cocaine with intent to distribute, Jackson could still be convicted of aiding and abetting Armstrong. In fact, over Jackson's objection, the court included an aiding and abetting jury instruction because there was sufficient evidence for a jury to find that even if Jackson himself did not possess the

---

[4] *Tome* and *Trujillo* involved Rules 803(24) and 804(b)(5) of the Federal Rules of Evidence which were combined and transferred to Rule 807 in 1997. *See* Fed. R. Evid. 807 1997 advisory committee's notes. Therefore, we consider these cases relevant to the Rule 807 analysis.

cocaine with intent to distribute, he aided and abetted that conduct by hiding the cocaine when the officers arrived at the house. *See United States v. Perez*, 963 F.2d 314, 316 (10th Cir. 1992).

**AFFIRMED**.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge